A

Case 1:20-cv-11478-JCB   Document 1-1   Filed 08/05/20   Page 2 of 45

| CIVIL ACTION COVER SHEET | DOCKET NUMBER 20 - 1435 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| PLAINTIFF(S): | Gerald Scandlitio | COUNTY | Middlesex |
|---|---|---|---|
| ADDRESS: | 32 Drury Lane, Wakefield MA 01880 | | |
| | | DEFENDANT(S): | A Step Ahead -Boston, LLC |
| ATTORNEY: | Charles P. Kindregan, Beacon Law Group LLC | | |
| ADDRESS: | 470 Atlantic Ave., suite 400, Boston MA 02210 | ADDRESS: | 21 A Street, Burlington MA |
| BBO: | 554947 | | |

## TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| A04 | Employment Contract | F | ☒ YES   ☐ NO |

*"If "Other" please describe:

Is there a claim under G.L. c. 93A?
☐ YES   ☒ NO

Is this a class action under Mass. R. Civ. P. 23?
☐ YES   ☒ NO

### STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

#### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ........................................................................................................... $ _____
2. Total doctor expenses ............................................................................................................. $ _____
3. Total chiropractic expenses ..................................................................................................... $ _____
4. Total physical therapy expenses ............................................................................................. $ _____
5. Total other expenses (describe below) .................................................................................... $ _____
Subtotal (A): $ _____

B. Documented lost wages and compensation to date ................................................................... $ _____
C. Documented property damages to date ..................................................................................... $ _____
D. Reasonably anticipated future medical and hospital expenses ................................................. $ _____
E. Reasonably anticipated lost wages ........................................................................................... $ _____
F. Other documented items of damages (describe below) ..............................................................

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

TOTAL (A-F):$160,000+

#### CONTRACT CLAIMS
(attach additional sheets as necessary)

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).
Provide a detailed description of claim(s):

TOTAL: $ 160,000 +

See Attached showing minimum damages of $160,000

Signature of Attorney/ Unrepresented Plaintiff: X _____    Date: 6-18-20

RELATED ACTIONS: Please provide the case number, case name, and county of any related actions pending in the Superior Court.

#### CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney of Record: X _____    Date: 6-18-20

# CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

**AC Actions Involving the State/Municipality ***

| | |
|---|---|
| AA1 Contract Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AB1 Tortious Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AC1 Real Property Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AD1 Equity Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AE1 Administrative Action involving Commonwealth, Municipality, MBTA,etc. | (A) |

**CN Contract/Business Cases**

| | |
|---|---|
| A01 Services, Labor, and Materials | (F) |
| A02 Goods Sold and Delivered | (F) |
| A03 Commercial Paper | (F) |
| A04 Employment Contract | (F) |
| A05 Consumer Revolving Credit - M.R.C.P. 8.1 | (F) |
| A06 Insurance Contract | (F) |
| A08 Sale or Lease of Real Estate | (F) |
| A12 Construction Dispute | (A) |
| A14 Interpleader | (F) |
| BA1 Governance, Conduct, Internal Affairs of Entities | (A) |
| BA3 Liability of Shareholders, Directors, Officers, Partners, etc. | (A) |
| BB1 Shareholder Derivative | (A) |
| BB2 Securities Transactions | (A) |
| BC1 Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. | (A) |
| BD1 Intellectual Property | (A) |
| BD2 Proprietary Information or Trade Secrets | (A) |
| BG1 Financial Institutions/Funds | (A) |
| BH1 Violation of Antitrust or Trade Regulation Laws | (A) |
| A99 Other Contract/Business Action - Specify | (F) |

* Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

† Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

**ER Equitable Remedies**

| | |
|---|---|
| D01 Specific Performance of a Contract | (A) |
| D02 Reach and Apply | (F) |
| D03 Injunction | (F) |
| D04 Reform/ Cancel Instrument | (F) |
| D05 Equitable Replevin | (F) |
| D06 Contribution or Indemnification | (F) |
| D07 Imposition of a Trust | (A) |
| D08 Minority Shareholder's Suit | (A) |
| D09 Interference in Contractual Relationship | (F) |
| D10 Accounting | (A) |
| D11 Enforcement of Restrictive Covenant | (F) |
| D12 Dissolution of a Partnership | (F) |
| D13 Declaratory Judgment, G.L. c. 231A | (A) |
| D14 Dissolution of a Corporation | (F) |
| D99 Other Equity Action | (F) |

**PA Civil Actions Involving Incarcerated Party †**

| | |
|---|---|
| PA1 Contract Action involving an Incarcerated Party | (A) |
| PB1 Tortious Action involving an Incarcerated Party | (A) |
| PC1 Real Property Action involving an Incarcerated Party | (F) |
| PD1 Equity Action involving an Incarcerated Party | (F) |
| PE1 Administrative Action involving an Incarcerated Party | (F) |

**TR Torts**

| | |
|---|---|
| B03 Motor Vehicle Negligence - Personal Injury/Property Damage | (F) |
| B04 Other Negligence - Personal Injury/Property Damage | (F) |
| B05 Products Liability | (A) |
| B06 Malpractice - Medical | (A) |
| B07 Malpractice - Other | (A) |
| B08 Wrongful Death - Non-medical | (A) |
| B15 Defamation | (A) |
| B19 Asbestos | (A) |
| B20 Personal Injury - Slip & Fall | (F) |
| B21 Environmental | (F) |
| B22 Employment Discrimination | (F) |
| BE1 Fraud, Business Torts, etc. | (A) |
| B99 Other Tortious Action | (F) |

**RP Summary Process (Real Property)**

| | |
|---|---|
| S01 Summary Process - Residential | (X) |
| S02 Summary Process - Commercial/ Non-residential | (F) |

**RP Real Property**

| | |
|---|---|
| C01 Land Taking | (F) |
| C02 Zoning Appeal, G.L. c. 40A | (F) |
| C03 Dispute Concerning Title | (F) |
| C04 Foreclosure of a Mortgage | (X) |
| C05 Condominium Lien & Charges | (X) |
| C99 Other Real Property Action | (F) |

**MC Miscellaneous Civil Actions**

| | |
|---|---|
| E18 Foreign Discovery Proceeding | (X) |
| E97 Prisoner Habeas Corpus | (X) |
| E22 Lottery Assignment, G.L. c. 10, § 28 | (X) |

**AB Abuse/Harassment Prevention**

| | |
|---|---|
| E15 Abuse Prevention Petition, G.L. c. 209A | (X) |
| E21 Protection from Harassment, G.L. c. 258E | (X) |

**AA Administrative Civil Actions**

| | |
|---|---|
| E02 Appeal from Administrative Agency, G.L. c. 30A | (X) |
| E03 Certiorari Action, G.L. c. 249, § 4 | (X) |
| E05 Confirmation of Arbitration Awards | (X) |
| E06 Mass Antitrust Act, G.L. c. 93, § 9 | (A) |
| E07 Mass Antitrust Act, G.L. c. 93, § 8 | (A) |
| E08 Appointment of a Receiver | (X) |
| E09 Construction Surety Bond, G.L. c. 149, §§ 29, 29A | (A) |
| E10 Summary Process Appeal | (X) |
| E11 Worker's Compensation | (X) |
| E16 Auto Surcharge Appeal | (X) |
| E17 Civil Rights Act, G.L. c.12, § 11H | (A) |
| E24 Appeal from District Court Commitment, G.L. c.123, § 9(b) | (X) |
| E25 Pleural Registry (Asbestos cases) | |
| E94 Forfeiture, G.L. c. 265, § 56 | (X) |
| E95 Forfeiture, G.L. c. 94C, § 47 | (F) |
| E99 Other Administrative Action | (X) |
| Z01 Medical Malpractice - Tribunal only, G.L. c. 231, § 60B | (F) |
| Z02 Appeal Bond Denial | (X) |

**SO Sex Offender Review**

| | |
|---|---|
| E12 SDP Commitment, G.L. c. 123A, § 12 | (X) |
| E14 SDP Petition, G.L. c. 123A, § 9(b) | (X) |

**RC Restricted Civil Actions**

| | |
|---|---|
| E19 Sex Offender Registry, G.L. c. 6, § 178M | (X) |
| E27 Minor Seeking Consent, G.L. c.112, § 12S | (X) |

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

EXAMPLE:

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES  ☐ NO |

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF** - The plaintiff shall set forth, on the face of the civil action cover sheet (or attach additional sheets as necessary), a statement specifying the facts on which the plaintiff relies to determine money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served with the complaint. A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.

**DUTY OF THE DEFENDANT** - If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with his/her answer a statement specifying the potential damages which may result if the plaintiff prevails.

**A CIVIL COVER SHEET MUST BE FILED WITH EACH COMPLAINT.**
**FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY**
**MAY RESULT IN DISMISSAL OF THIS ACTION.**

Attachment to Civil Action Cover Sheet of Gerald Scandiffio

Mr. Scandiffio was wrongfully terminated under a one-year contract that provided for automatic annual renewals unless terminated. Given that Mr. Scandiffio was a model employee who did exemplary work and was always given excellent reviews before being the subject of retaliation, more likely than not that he would have remained employed for many years to come if ASA did not retaliate against him for engaging in protected activity. At a minimum, however, Mr. Scandiffio was out of work for at least 16 months and lost his annual salary of $120,000 per year during that time, equating to lost wages of $160,000. Mr. Scandiffio would have also started to receive profit sharing within a few months of the wrongful termination as promised by defendant. Mr. Scandiffio's reputation was also harmed. The minimum damages suffered are $160,000.

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX,ss                                          SUPERIOR COURT
                                                     C.A. No 20-1435

```
_____
                            )
GERALD SCANDIFFIO,          )
                  Plaintiff )
                            )
     v.                     )
                            )
A STEP AHEAD – BOSTON, LLC  )
                  Defendant )
_____ )
```

## COMPLAINT AND JURY DEMAND

The plaintiff, Gerald Scandiffio hereby asserts the following for his Complaint.

### PARTIES

1.     Plaintiff Gerald Scandiffio ("Scandiffio") is a natural person who resides in Wakefield Massachusetts.

2.     The defendant A Step Ahead – Boston, LLC ("ASA") is, upon information and belief, a New York entity which is registered in Massachusetts and which maintains offices 21 A Street in Burlington MA.  Upon information and belief, ASA is also known as A Step Ahead Prosthetics – Boston, LLC and/or A Step Ahead Prosthetics & Orthotics – Boston, LLC.

### JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to G.L. c. 212, § 4.

4.     The Court has personal jurisdiction over the defendant because it conducts business in Middlesex County Massachusetts, because the actions underlying the claims herein occurred primarily and substantially in the Commonwealth, and because the contract between the parties specifies that with respect to any claim "the courts of Middlesex County, Massachusetts... shall

1

have exclusive jurisdiction to hear and decide such matter, and the parties hereby submit to jurisdiction to such courts."

5.      Venue is proper in Middlesex County because the contract between the parties provided for jurisdiction in Middlesex County.  In any event, the plaintiff resides in Middlesex County, and the defendant maintains its place of business in Middlesex County.

FACTS

Mr. Scandiffio's Passion for Prosthetics

6.      When Mr. Scandiffio was twenty years old, he lost his leg in a construction accident.

7.      After a period of healing, anger, frustration, despair, and hopelessness, Mr. Scandiffio came to grips with the tragedy that befell him and committed himself to improving the lives of others who have lost limbs and body parts.

8.      Mr. Scandiffio became a prosthetist so he could work with amputees and help them with the struggles that he himself had endured.  Mr. Scandiffio is an American Board Certified Prosthetist.

9.      Mr. Scandiffio also devoted himself to volunteer activities that help amputees.  For example, he volunteers every year at an annual "Pirate Camp" for children who have lost limbs, which is run by the Never Say Never Foundation (the "Pirate Camp").  Mr. Scandiffio also volunteers as an instructor with AmpSurf, a non-profit entity for amputee surfers.

10.     While he worked at ASA, ASA said the following about Mr. Scandiffio on its website: "He is a below the knee amputee who is dedicated and passionate about working with fellow amputees of all levels and providing them with the support and tools necessary to achieve their best.  For the majority of his career, [Mr. Scandiffio] has been both an active role model for amputees as well as a patient advocate."

2

### Mr. Scandiffio Joins A Step Ahead

11.      In or about February 2015 Mr. Scandiffio went to work as a prosthetist at ASA in its offices in Burlington, Massachusetts.

12.      The Burlington office of ASA was generally run by Robert Emerson ("Mr. Emerson"). Upon information and belief, Mr. Emerson has some ownership interest in ASA with Erik Schaffer ("Mr. Schaffer"). Mr. Schaffer spends most of his time in New York at an affiliated company, A Step Ahead Prosthetics & Orthotics, LLC.

### The Employment Agreement

13.      Mr. Scandiffio entered a written contract with ASA. A copy of the Contract is attached as Exhibit 1 to this Complaint (the "Contract").

14.      In the Contract, ASA identifies itself as a Massachusetts Limited Liability Company, but a search of the records of the Secretary of State demonstrate that it is, in reality, a New York entity.

15.      Under the terms of the Contract, ASA agreed to pay Mr. Scandiffio an annual salary of $110,000, payable in equal bi-weekly installments, less taxes and deductions.

16.      Mr. Scandiffio was told in 2016 and again in 2017 that his salary was increased by .

17.      The term of employment under the Contract was one year which would automatically renew for successive one-year terms, "unless earlier terminated in accordance with this agreement." Contract, § 5.1.

18.      The Contract allowed the Employer or the Employee to terminate the Contract "for cause" in certain situations. Contract, § 8.1, 8.2, and 8.3. In some cases, the Contract specifies a notice of ten (10) days for a termination for cause subject to being cured during the ten days, and in other cases an immediate notice could be provided with no right of cure.

3

19.　The Contract also allowed for termination "without cause" providing that a party provided thirty (30) days' notice.

20.　The Contract also contained a "non-compete" provision, which purported to prevent Mr. Scandiffio from working for any prosthetic or orthotic laboratory within a twenty-five mile radius of ASA's offices if he was terminated "for cause" by ASA or if Mr. Scandiffio terminated the agreement without cause after the first ninety days of his employment, as well as a variety of other restrictive covenants that would hamper any effort by Mr. Scandiffio to work anywhere else.

21.　At the time he was hired, Mr. Scandiffio was also informed that he would begin profit sharing once he reached the beginning of his fourth year with ASA. Specifically, Mr. Scandiffio would begin receiving profit sharing over a ten-year period, at the end of which he would be "fully vested as an equity partner for a 10% stake." See Exhibit 2.

The Agreement on Attending the Pirate Camp

22.　Every year in early October Mr. Scandiffio participates as a volunteer at the Pirate Camp in Florida.

23.　When Mr. Scandiffio was hired, he specifically discussed one stipulation with Mr. Schaffer and Mr. Emerson, namely that he needed to attend the Pirate Camp each year. Mr. Schaffer specifically told Mr. Scandiffio that there would be "no problem" with him attending the Camp. Indeed, Mr. Schaffer said that he thought it was a good thing for Mr. Scandiffio to do.

24.　At one point, in recognition of Mr. Scandiffio's participation in the Camp, Mr. Schaffer had the company make a "pirate leg" for Mr. Scandiffio.

25.　In multiple conversations Mr. Scandiffio was encouraged to continue attending the Camp every year and was told that he had permission to do so.

4

26.   Each year after joining ASA, Mr. Scandiffio did attend the Camp and there was never any issue raised by ASA.

27.   In 2017, Schaffer was planning to attend the pre-Camp golf tournament with Mr. Scandiffio but a serious storm delayed the golf tournament, and it did not go forward. Mr. Scandiffio attended the Camp nevertheless.

28.   In Mr. Scandiffio's year-end review in 2017, Mr. Scandiffio and Mr. Schaffer specifically discussed the fact that Mr. Scandiffio would continue attending the Camp the next year – 2018. Mr. Schaffer continued to be in favor of this volunteer opportunity, but he said that going forward the time to attend the camp should be "unpaid," and Mr. Scandiffio agreed without hesitation.

## Mr. Scandiffio was a Model Employee

29.   Mr. Scandiffio was always given excellent reviews during the time he worked at ASA. Mr. Emerson and Mr. Schaffer always praised the high quality of Mr. Scandiffio's work for ASA.

30.   According to ASA's employment records, Mr. Scandiffio was a "valuable employee," had a "positive attitude," had "infectious" enthusiasm, "solid" judgment, and was "always looking for more" work. ASA considered Mr. Scandiffio to be "patient centered" and "willing to do what it takes." Mr. Scandiffio was lauded as a "positive role model" and consistently had very high scores in all categories that ASA used to rate its employees every year.

31.   Both Mr. Emerson and Mr. Schaffer expressed great confidence in Mr. Scandiffio's work and performance at ASA.

## Growing Concerns about Billing Practices

5

32.    Mr. Scandiffio's job entailed making medical prosthetic devices and providing the services related thereto. Among other things, Mr. Scandiffio with patients to provide appropriate and proper prosthetic and orthotic devices for patients. This included appointments with patients and work in developing and building prosthetic devices for the patients.

33.    When Mr. Scandiffio met with a patient to deliver a prosthetic or orthotic, he would receive a "delivery sheet" from ASA's billing department so the patient could sign off that he or she had received the device(s) and services rendered.

34.    Mr. Scandiffio noted that many times the billing department had added items to the delivery sheets that were not being delivered to patients. Mr. Scandiffio's practice was to cross off such items, and have the patients sign only for items that were actually being delivered.

35.    At some point, Mr. Scandiffio was directed by Mr. Schaffer to stop crossing off items on delivery sheets. He was told to obtain the patient signatures, and then submit the delivery sheets to Mr. Emerson, and that Mr. Emerson would cross off items that were not appropriate, if any, after the patients had signed the sheets.

36.    In addition, upon information and belief, some patients of ASA were asked to sign "delivery statements" before their prosthetics or orthotic devices were delivered. This would only be necessary if the "deliveries" were being billed out before they were delivered.

37.    Mr. Scandiffio learned of a patient who had an orthotic brace made by ASA, but the billing for the file showed prosthetic "billing codes" which would not be accurate for an orthotic brace. When a co-worker mentioned this billing issue to Mr. Emerson, he became very angry and said "don't worry about it." Mr. Emerson referred to Mr. Schaffer being an "aggressive biller."

38.     Mr. Scandiffio then learned at some point that patients were routinely invoiced for "cosmetic covers," even when they did not request them.

39.     In his 2017 year-end review, Mr. Scandiffio was praised for his good work. Mr. Schaffer also said he was "making legs too good" and that patients were able to go for "4-5 years" on Mr. Scandiffio's prosthetics. Mr. Schaffer instructed Mr. Scandiffio to change the way he made prosthetics. Mr. Schaffer said "the way you do it, we can't bill for maintenance and repairs." Mr. Schaffer said that this would also allow ASA to recommend new legs more frequently.

40.     Mr. Scandiffio was concerned by Mr. Schaffer's statements. Mr. Scandiffio continued to make the highest quality prosthetics possible.

Increasing Concerns in 2018

41.     In or about June 2018, Mr. Scandiffio was told that he had to fill out "maintenance" sheets and bill for something even if he did no actual maintenance. Mr. Scandiffio refused to bill for maintenance unless he did actual maintenance. Mr. Scandiffio was clear that he felt it would be inappropriate to create a record of maintenance activity when no maintenance was done.

42.     In light of the various observations that he had made regarding billing, and his growing concerns about the same, Mr. Scandiffio began to elevate his awareness of billing-related issues.

43.     During this time period in 2018 Mr. Scandiffio saw, among other things, evidence of billing for prosthetics long before they were delivered. He observed cases of "upbilling," such as billing for an upper extremity prosthetic limb when there was only a missing finger, and billing for a below the knee prosthetic limb for a patient who needed a silicone toe. Another case involved an instance where Mr. Scandiffio replaced a flexible inner liner, but ASA then billed for replacement of the entire socket. Mr. Scandiffio also saw billing for a prosthetic that a

patient did not want and did not accept, and a number of cases where the clinical notes do not match up with the billing.

44.     In the process of looking into these concerns, Mr. Scandiffio reviewed one file and informed the administrative assistant that the file was missing critical information necessary for the billing that was sent out. The file had no clinical chart or other appropriate documentation to support the billing.

45.     The administrative assistant told Mr. Emerson of Mr. Scandiffio's actions in checking the file. Mr. Scandiffio was summoned to a meeting with Mr. Emerson and Mr. Schaffer joined them on the phone. Mr. Schaffer wanted to know why Mr. Scandiffio was looking at files and asking about insurance and billing fraud. Mr. Scandiffio explained that he was very concerned about billing matters at ASA and he thought the company may not be doing things properly, and that it may be illegal conduct. Mr. Scandiffio said that ASA could be in serious trouble because of these improper billing issues if there was an audit or if the files were reviewed. Mr. Schaffer told him, however, "don't worry, we have the proper paperwork for everything."

46.     In August 2018 there was an issue in which Mr. Scandiffio did some repair work for a patient on an older prosthetic while the patient was waiting for a new prosthetic to be made. Mr. Scandiffio learned that the repair work on the old prosthetic was not billed. Mr. Scandiffio was concerned because repair work is properly billable unless there was no reason for the repair, and Mr. Scandiffio thought that maybe the repair work was not billed because ASA had already billed for the new leg, even though it was not fully made and had not been delivered to the patient. Mr. Scandiffio asked Mr. Schaffer about this potential impropriety regarding the billing but Mr. Schaffer told Mr. Scandiffio "don't worry about it, it is taken care of."

<u>ASA Decides to Fire Mr. Scandiffio for Raising Concerns about Improper Billing</u>

47.    Mr. Scandiffio believed that he was right and justified to raise concerns about potentially inappropriate and illegal billing activity to his employer and to advise them of the possible issues with such conduct.

48.    In addition to the billing issues, which he knew were strictly governed by applicable laws and regulations, Mr. Scandiffio was concerned about patient care and health. The lack of required clinical documentation, best practices in building prosthetic devices, and billing not matching the services provided were all significant issues to Mr. Scandiffio.

49.    ASA, however, did not respond positively to Mr. Scandiffio's concerns, and instead decided to retaliate and fire Mr. Scandiffio for raising such matters to his managers.

50.    ASA also knew that in a few months, at the beginning of the next year, ASA would be responsible for providing "profit sharing" payments to Mr. Scandiffio from ASA, which would increase each year until he became an equity partner with a 10% stake in ASA. Mr. Emerson and Mr. Schaffer, upon information and belief, did not want Mr. Scandiffio to start receiving profits as promised to him.

51.    ASA devised a plan to create a pretext for terminating the Contract. Knowing that his annual trip to the Pirate Camp was coming in October 2018, ASA decided to use that as a basis to fire Mr. Scandiffio.

52.    ASA's plan was to get Mr. Scandiffio to leave on the trip to the Camp that everyone knew he was taking, and then proclaim after the fact that it was not permissible so he could be fired immediately for cause.

Mr. Scandiffio Goes to the Pirate Camp

9

53.     Mr. Scandiffio repeatedly reminded Mr. Emerson, his direct supervisor, many times over the course of several months in 2018 that he would be going to the Camp, just like he did every year. No one raised any concern.

54.     On the day before Mr. Scandiffio's scheduled departure for the Camp, Mr. Emerson avoided Mr. Scandiffio. Mr. Scandiffio called Mr. Schaffer before leaving the office to let him know that he was leaving for the Camp. Mr. Schaffer said he did not have time to talk and would have to call him back, but never did so.

55.     Mr. Scandiffio was never told that he could not go the Camp before he left and arrived in Florida. To the contrary, going all the way back to his 2017 year-end review, he had repeatedly discussed the matter with Mr. Emerson and Mr. Schaffer and been encouraged to go just as he did every year.

56.     When Mr. Scandiffio's plane landed in Florida the next day, he received a message "denying" him permission to attend the Camp.

57.     The "denial" was then followed by a lengthy letter from Mr. Schaffer terminating Mr. Scandiffio's employment "for cause" and spelling out a series of restrictive covenants which ASA would enforce against him. ASA also reminded him that a breach of certain covenants would "immediately trigger" a liquidated damages clause, the effect of which would require Mr. Scandiffio to disgorge all of the earned income he received for an entire year.

58.     Although ASA pretextually fired Mr. Scandiffio "for cause" for not being in the office, its true intent and motive was to punish him for raising public policy concerns related to billing issues, insurance coding issues, illegal billing, and patient health concerns.

59.     Mr. Scandiffio brought those issues to his supervisors' attention because it was the right and proper thing to do, and to try to prevent further improper conduct.

60.   In carrying out the scheme to create a pre-text to fire Mr. Scandiffio for cause, ASA sought to silence Mr. Scandiffio and to continue to punish him.  ASA took back a cell phone it had provided to him but refused to surrender Mr. Scandiffio's long-time personal phone number which he had put on the phone.  ASA monitored communications to Mr. Scandiffio and, upon information and belief, interfered with communications regarding potential employment efforts he was seeking.

61.   Mr. Scandiffio's actions at ASA were in furtherance of proper public policy.  Mr. Scandiffio properly raised concerns about record-keeping, billing practices, and the treatment of patients.

62.   Medical billing is heavily regulated in Massachusetts and subject to statutory mandates.  This includes prosthetic devices and the services provided by ASA.  The applicable regulations are designed to provide for proper patient treatment, fair billing practices, and the prevention of fraud.  Mr. Scandiffio was entitled to raise concerns about inappropriate conduct in violation of the law.

## COUNT I
## BREACH OF CONTRACT

63.   Mr. Scandiffio repeats and realleges all of the foregoing allegations as if they were set forth in full below.

64.   The Parties entered into a Contract with each other.

65.   Mr. Scandiffio performed all of his obligations under the Contract.

66.   ASA breached the Contract.

67.   As a result of ASA's breach of contract, Mr. Scandiffio suffered damages in an amount to be proven at trial.

11

## COUNT II
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

68.     Mr. Scandiffio repeats and realleges all of the foregoing allegations as if they were set forth in full below.

69.     The Contract incorporated an implied duty of good faith and fair dealing.

70.     Mr. Scandiffio performed all of his duties and obligations under the Contract.

71.     ASA sought to punish and retaliate against Mr. Scandiffio for raising concerns such as overbilling to medical insurers, up-billing, and other matters of public import or violations of law.

72.     ASA created a pretext to fire Mr. Scandiffio "for cause," and then acted on that pretext.

73.     ASA terminated the contract to deprive Mr. Scandiffio of profit-sharing opportunities that were imminent, and further because it sought to deprive him of the continued benefits of the annual contract by means of a pretextual firing for cause. ASA also sought to unfairly deprive Mr. Scandiffio of the other benefits of a firing without cause, such as the right to obtain employment elsewhere in his chosen field.

74.     ASA breached the implied covenant of good faith and fair dealing.


WHEREFORE, the plaintiff asks this Honorable Court to:

   1)  Enter Judgment for the plaintiff;

   2)  Award the plaintiff his damages, with interest;

   3)  Award the plaintiff his costs, legal fees, expert witness fees, and expenses to the fullest extent permitted;

   4)  Award such other and further relief as is just and appropriate.

12

## JURY DEMAND

The plaintiff demands a trial by jury on all issues so triable.

GERALD SCANDIFFIO
By His Attorney,

Charles P. Kindregan (BBO#554947)
BEACON LAW GROUP, LLC
470 Atlantic Ave., suite 400
Boston MA  02210
617-235-8620
ckindregan@beaconlawgroup.com

June 18, 2020

13

1

# EXHIBIT 1

PROSTHETIST EMPLOYMENT AGREEMENT

between

A STEP AHEAD PROSTHETICS & ORTHOTICS-BOSTON, LLC

and

Jerry Scandiffio C.P.

Law Offices of:
PETER BIRZON & ASSOCIATES
400 Jericho Turnpike - Suite 100
Jericho, New York 11753
(516) 942-9100

{00023607.DOC} 1

# TABLE OF CONTENTS

Page

1.  EMPLOYMENT..................................................................................................... 1

2.  EMPLOYEE'S REPRESENTATIONS AND COVENANTS................................. 2

3.  REPRESENTATIONS, WARRANTIES & COVENANTS OF EMPLOYER ............... 2

4.  COMPENSATION ................................................................................................ 2

5.  TERM OF EMPLOYMENT ................................................................................. 3

6.  HEALTH INSURANCE/BENEFITS .................................................................... 3

8.  TERMINATION FOR CAUSE ............................................................................. 4

9.  TERMINATION WITHOUT CAUSE ................................................................... 5

10. RIGHTS UPON TERMINATION ......................................................................... 6

11. CONFIDENTIALITY/NON-DISCLOSURE ......................................................... 6

12. RESTRICTIVE COVENANT/NON-SOLICITATION OF EMPLOYER'S CLIENTS ..... 7

13  NOTICES.............................................................................................................. 9

14. GOVERNING LAW .............................................................................................. 9

15. MAIL ..................................................................................................................... 10

16. MISCELLANEOUS .............................................................................................. 10

EXHIBIT A ................................................................................................................... 12

DUTIES AND RESPONSIBILITIES OF EMPLOYEE ............................................... 12

Exhibit A – Duties and Responsibilities

AGREEMENT executed this 4th day of February, 2015 and made effective as of the 4th day of February, 2015, by and between A STEP AHEAD PROSTHETICS & ORTHOTICS-BOSTON, LLC a Massachussetts Limited Liability Company with its principal office located at 21 A Street, Burlington, MA 01803 ("Employer") and Jerry Scandifio, C.P., residing at 32 Bury Lane, Wakefield, Massachussetts, 01880 (the "Employee").

WHEREAS, Employer maintains a laboratory, specializing in prosthetic and orthotic evaluation, design, fitting, production and manufacture; all at; 21 A Street, Burlington, MA 01803, and

WHEREAS, Employer's client base is local and national in scope; and,

WHEREAS, Employee is a certified prosthetist and is experienced in providing professional prosthetist services that are desired by Employer and Employee desires to be employed by Employer; and,

WHEREAS the parties hereto agree to work hereunder, in reliance upon and in exchange for the mutual covenants and promises that follow.

NOW, THEREFORE, the parties agree as follows:

1. EMPLOYMENT

Commencing as of the Effective Date, the Employee shall faithfully serve Employer as a certified prosthetist until this agreement is terminated as hereinafter provided:

1.1     Employee's responsibilities include, but are not limited to, providing those services, which are within the scope of those itemized duties set forth in Exhibit A and as the Employer may reasonably direct. Employee shall keep and maintain (or cause to be kept and maintained) appropriate records relating to all duties rendered by Employee under this agreement, including the documentation required by the private and government-run third party payor that make payments to Employer.

1.2     The Employee shall render duties to Employer at Employer's offices at 21 A Street, Bulington, MA 01803 (the "Office"), and at such other places as the Employer may reasonably request.

1.3     Employee shall perform all duties assigned by the Employer and all work performed is subject to review and evaluation by Employer. This notwithstanding, the Employee shall make himself available to meet with the Employer at the Employer's reasonable request, including the one (1) hour before and the one (1) hour after regularly scheduled work hours.

1.4     Employee acknowledges that his services hereunder do not confer upon him any ownership interest in or claim upon any fees charged by the Employer for Employee's services, whether the same are collected during the term hereof or after the termination hereof, and Employee hereby disclaims and renounces any such interest or claim in the same.

2.    **EMPLOYEE'S REPRESENTATIONS AND COVENANTS**

Employee represents and covenants now and for the duration of this agreement that:

2.1    Employee has never been convicted, pleaded nolo contendere, or confessed to any (i) felony or (ii) any crime or other act (whether misdemeanor or other) involving dishonesty, moral turpitude, fraud, misappropriation, embazzlement, sexual harassment or any act of race-based aggression;

2.2    During the Term and any Renewal Term, Employee will not work (directly or indirectly) as a prosthetist, manager, employee, consultant, partner, member, stockholder, owner, investor or otherwise, in a business or facility that provides, fits, manufactures, distributes or designs prosthetics or orthotics;

2.3    Employee may execute this agreement and perform his obligations hereunder without conflicting with, breaching or defaulting under any other agreement to which he is a party or is bound.

3.    **EMPLOYER'S REPRESENTATIONS & COVENANTS**

Employer hereby makes the following representations and covenants to the Employee, each of which is material to this agreement and is being relied on by the Employee, and shall be true as of the date hereof.

3.1    Employer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Massachusetts. The managing member of the Company is Robert Emerson.

3.2    The execution and delivery of this agreement by the Employer (a) has been duly authorized by all necessary corporate action, and this agreement constitutes the valid and binding obligation of Employer and (b) will not violate or conflict with any provision of law or of Employer's Articles of Organization and will not result in a breach of or constitute a default under any agreement or instrument to which Employer or any of its members may be a party, or by which any of them may be bound or affected.

4.    **COMPENSATION**

4.1    Employer shall pay Employee an Annual Salary of ($110,000), payable in twenty six (26) equal, consecutive bi-weekly installments of ($4230.77) less all applicable taxes and deductions each commencing on the Effective Date.

4.2    The amounts payable pursuant to this Article 4 shall constitute the sole and exclusive compensation for Employee's duties during the term of this agreement. All such compensation shall be paid subject to any required withholding and other taxes and deductions.

4.3     Employee's normal workday shall start at 6:00 AM and end at 4:00 PM Monday through Thursday, and from 7:30 AM until 2:30 PM on Friday  Employee is not an hourly wage-earning employee and is hired to provide professional services hereunder.

4.4     During each Renewal Term, the Annual Salary shall be reviewed by Employer.

## 5.   TERM OF EMPLOYMENT

5.1     The term of employment shall be for a period of one (1) year, commencing as of the Effective Date (the "Term"), unless sooner terminated as hereinafter provided.  This agreement and all the terms herein shall be automatically renewed for successive one (1) year terms (each a "Renewal Term") unless earlier terminated in accordance with this agreement. Each Renewal Term shall be subject to the same terms, conditions and covenants as provided hereunder for the Term.

5.2     The Employer shall provide an annual list of Holidays each year throughout the term of this agreement when the Employee will not be expected to work.

## 6.   HEALTH INSURANCE/BENEFITS

6.1     Employer shall provide individule health insurance policy.

6.2     Employer acknowledges that it has procured statutory disability and worker's compensation insurances for Employee.

6.3     Upon the first Renewal Term hereof, Employee will be eligible to participate in the 401K retirement plan consistent with its terms and conditions.

6.4     Employee shall receive a cell phone with a prepaid monthly plan, but shall be responsible for all excess charges applicable thereto.

## 7.   VACATION AND OTHER LEAVE

7.1     Employee is entitled to two (2) weeks of fully paid vacation per full work year. Vacation will be taken at such times as agreed upon by the parties.  Unused vacation time may not be carried over from year to year unless by Employer's written consent or upon the event that Employer has prevented Employee from taking his entitled two (2) week vacation, within one (1) full work year.

7.2     Employee is will provide at least three (3) weeks advanced notice of such vacation to Robert Emerson provided it does not overlap with previously scheduled vacation time of other employees who can substitute for Employee, which determination shall be made at the discretion of Robert Emerson. Employee is not permitted to utilize more than one (1) week of contiguous vacation without the consent of the Employer.

7.3    Employee is entitled to three (3) days sick leave with pay as is medically necessary. No sick leave can be accrued from year to year. Upon termination of this agreement, Employee shall not be entitled to any additional compensation for unused sick leave time.

## 8.    TERMINATION FOR CAUSE

8.1    If Employee substantially violates a term or provision of this agreement or fails to perform the duties required hereunder, then Employer may, by notice in writing thereof, terminate this agreement provided Employer has given written notice of breach to Employee, which breach has not been cured within ten (10) days of such notice's delivery.   Upon termination hereunder, Employer will pay Employee's Annual Salary pursuant to Article 4 which is accrued but unpaid as of the date of termination.

8.2    The Employer has the right to immediately terminate this agreement, by notice in writing thereof, upon the occurrence of any of the events hereinafter set forth and Employer's sole obligation will be to pay the Employee pursuant to Article 4 which is accrued but unpaid as of the effective date of such notice.

(i)    Employee's repeated failure to perform the essential duties required hereunder or failure or refusal to comply with the material and reasonable policies, standards and regulations of Employer which from time to time may be established, of which Employee has written notice;

(ii)    Employee commits or is convicted of, pleads nolo contendere to or confesses to any felony offense or any crime or other act involving dishonesty, moral turpitude, fraud, misappropriation or embezzlement;

(iii)    The Employee (a) engages in the illegal use of drugs, (b) is under the influence of drugs or alcohol while engaged in the performance of his/her duties and obligations required under this agreement, or (c) fails to undergo drug or alcohol screening upon Employer's reasonable request, it being specifically understood that the Employee hereby consents to such testing;

(iv)    In the event the Employee is absent without leave from Employer without specifying to Employer the nature of the emergency therefore, it being expressly acknowledged and understood by the Employee that his duties, functions and responsibilities hereunder shall require the Employee's full-time, scheduled personal attendance at the offices of Employer, with the exception of federally protected leaves of absence, including but not limited to maternity leave and mandated jury service;

(v)    In the event that Employee is found to have disseminated to a third party any Confidential Information of the Employer, or to have disseminated any Protected Health Information (PHI) of Employer's clients as those terms are defined in Article 11 herein or violated any provisions of the Restrictive Covenant or Non-solicitation provisions of Article 12;

(vi)    If, prior to the expiration of the term fixed for this agreement, Employer is forcibly dissolved or liquidated, for any reason whatsoever, in such event, this agreement will

immediately terminate as of the date of dissolution or liquidation and each of the parties will be released and discharged from any and all obligations, terms, covenants and agreements contained herein, except for those obligations which are expressly to continue subsequent to the termination of this agreement, including the payment of salary, which has accrued but remains unpaid as of the date of termination;

(vii)   A good faith determination by the Employer that Employee has:

a)   engaged in any act of personal dishonesty, gross negligence, or willful misconduct that has a material adverse effect on the Employer, its business operations, financial condition, assets, prospects, or reputation; or

b)   engaged in conduct, including but not limited to, excessive absence, which the Employer considers to be detrimental to its objectives or business operations, and which conduct the Employer reasonably believes will continue; or

c)   materially breached any fiduciary duty to the Employer; or

d)   knowingly disclosed any of the Employer's confidential or other similar information; or

(viii)   Employee's breach of any material term of this agreement.

8.3   <u>Termination by Employee:</u>

Notwithstanding any language to the contrary, the Employee has the option to terminate this agreement "For Cause" upon or following the occurrence of any of the following events:

(i)   the failure of the Employer to make timely payment of the salary due the Employee;

(ii)   the death of Erik Schaffer;

(iii)   the dissolution of Employer;

(iv)   the bankruptcy or insolvency of Employer; or

(v)   the material breach of this agreement by Employer if such breach continues for a period of time longer than reasonably necessary to remedy the breach, provided however, that Employee provides written notice of breach.

9.   **TERMINATION WITHOUT CAUSE**

Either party may cancel and terminate this agreement upon thirty (30) days written notice, without specifying any reason therefore, and the agreement shall be deemed terminated from the

{00023607.DOC}5

effective date of such notice; and Employer's sole obligation will be to pay Employee's Annual Salary pursuant to Article 4 which is accrued but unpaid as of the date of termination.

## 10.   RIGHTS UPON TERMINATION

10.1    Upon termination of this agreement, as hereinabove provided, neither party shall have any further obligations hereunder except for (i) obligations accruing prior to the date of termination, including, without limitation, payment of the Employee's salary and (ii) obligations, promises, or covenants set forth herein that are expressly made to extend beyond the Term or Renewal Term.

10.2    The provisions of this Article will survive termination of this agreement and shall in no event be construed to be an exclusive remedy of the Employee and such remedy is cumulative and not exclusive of any rights or remedies, whether in law or in equity, otherwise available under the terms of this agreement or under federal, state and local statutes, rules and regulations.

10.3    All benefits will be paid by Employer through the effective date of any termination; and Employer's obligation to provide a cell phone and service and provide all other benefit payments will terminate upon the date of termination.

## 11.   CONFIDENTIALITY/NON-DISCLOSURE

11.1    The Employee recognizes and acknowledges that the business plans, strategies and operations utilized by Employer as well as any information pertaining to the financial or other affairs of the Employer are proprietary information of Employer and are hereinafter referred to as "Confidential Information." Employee acknowledges that this "Confidential Information" includes information about Employer's business, including, but not limited to, billing and accounting procedures, client personal and health care information, prosthetic and orthotic manufacturing and fabrication processes, breast restoration manufacturing, Skin Tone and texture manufacturing processes, silicone replication of missing body parts ("anaplastology"), information derived from research and development of orthodic and prosthetic devices.

11.2    Without Employer's prior written approval, Employee will never (whether during or after the termination of this agreement) disclose or disseminate any Confidential Information, or use or permit any person to examine, copy or duplicate any Confidential Information, and upon termination of this agreement, Employee will return to Employer all Confidential Information, including all devices, records, sketches, reports, proposals, lists, correspondence, equipment, documents, drawings, computer disks or any other computer media, specifications, tape recordings or other electronic recordings, programs, data and any other Confidential Information. This provision shall survive the termination of this agreement.

11.3    Employee covenants and agrees that he will not disclose or disseminate the treatment, diagnosis, name or address of Employer's clients to any third party; and all such information shall be kept strictly confidential, except where required by federal or state law.

11.4    Employee acknowledges that Employer provides unique services and products in its industry and that conveyance of the Confidential Information to any third party would substantially

diminish the competitive advantage that Employer maintains over other prosethetic and orthotic manufacturers. As such, Employee acknowledges that the Confidential Information has immeasurable and vast financial value and thus he agrees that upon his violation of the restrictions, and covenants contained in this article, he will be liable to Employer for the financial losses it sustains as a result thereof, and Employee further acknowledges Employer's right to receive immediate injunctive relief prohibiting violation of the covenants and terms contained herein.

11.5     For the purposes of this Article, the following are not Confidential Information – that which was (a) already in Employee's possession before disclosure thereof by Employer or (b) is obtained from generally available publicly disseminated sources.

11.6     Employee acknowledges that all identifying information pertaining to the clients of the Employer is Protected Health Information (PHI) as defined by the Health Insurance Portability & Accountability Act of 1996 and amendments (the "Act"), and Employee agrees that any dissemination of any PHI to any third party is strictly prohibited, and that any violation of this prohibition will result in Employee's termination and may result in remuneration damages as well in addition to any other causes of action available as defined by the Employer..

11.7     The covenants of this article shall be construed as an agreement ancillary to the other provisions of this agreement, and the existence of any claim or cause of action of Employee against Employer, whether predicated on this agreement or otherwise, shall not constitute a defense to the enforcement by Employer of this Article.

11.9     The terms, provisions and covenants of this article shall survive the termination of this agreement.

## 12.     RESTRICTIVE COVENANT/NON-SOLICITATION OF EMPLOYER'S CLIENTS

12.1     For the purpose of this Article "Restricted Period" shall mean during the term hereof and for the one (1) year period following termination of employment hereunder.

12.2     In consideration of the compensation to be paid hereunder, Employee shall not, during the Restricted Period, render services, either directly or indirectly, for any other prosthetic and orthotics laboratory anywhere within a twentyfive mile radius of the Office or any other location where Employee regularly provides services hereunder (the "Restricted Area").

12.3     This Article 12 shall only be binding upon Employee under the following circumstances:

   a)     If Employee voluntarily terminates this agreement without cause pursuant to Article 9, however Employee shall not be bound by this Article 12 if Employee voluntarily terminates this agreement without cause within ninety (90) days of the Effective Date.

b)   If Employer terminates Employee for cause pursuant to Article 8, at any time during the Term hereof.

12.4   If Employer terminates Employee without cause pursuant to Article 9, then Employee shall not be bound by this Article 12.

12.5   If Employee terminates this Agreement for cause pursuant to Article 8, then Employee shall not be bound by this Article 12.

12.6   If the Employee violates the restrictions contained in this Article, then Employee agrees to immediately pay Employer, as liquidated damages, the amount equal to the Annual Salary then in effect at the time of termination. If Employee has worked less than the Term, then the liquidated damages due hereunder shall be the amount actually received by Employee as the prorated Annual Salary. The parties agree that these liquidated damages represent a fair quantum of damage that will be sustained by Employer, while concurrently recognizing the burdensome and imprecise nature of determining exact damages; and these liquidated damages represent a fair and reasonable agreed estimate of those damages that Employer would sustain upon each instance of breach. Said sum will be due and payable by Employee to Employer upon demand.

12.7   Employee acknowledges the restrictions in this entire article and the procurement of his covenants are necessary for the protection of Employer and that any breach thereof will cause Employer irreparable damage. Employee agrees that Employer shall be entitled to issuance of an injunction in its favor enjoining the continued or threatened breach of these covenants. This provision shall not constitute a waiver of Employer's other remedies in law or in equity. If a Court of competent jurisdiction determines that the foregoing restrictions are unreasonable, then the restriction shall be reduced by the Court to the extent necessary to be enforced by said Court. Employer shall be entitled to specific performance or immediate preliminary and/or injunctive relief without the necessity of posting any bond, as well as pursue money damages, in so far as they can be determined, and attorney's fees and costs. Employee agrees that the existence of any claim or cause of action that he may have against Employer, whether predicated upon this agreement or any other contract, shall not constitute a defense to the enforcement by Employer of this restrictive covenant.

12.8   Employee repeats his acknowledgment that all clients serviced by the Employee pursuant to this agreement are the Employer's clients, regardless of whatever source derived. Employee hereby covenants that Employee will not service any client(s) of Employer, at any location whatsoever, regardless of its distance from any location of Employer, for a period of two (2) years following the termination of this agreement. Employee further agrees that for the two (2) year period following the termination of this agreement he will not directly or indirectly, solicit any client of Employer, by direct mailing, local publication, local flyer or other form of solicitation for his own benefit or for the benefit of any other prosthetics or orthotics laboratory or company, or any other third party providing similar products and services. However, during the Restricted Period Employee shall be permitted to advertise his services by bulk mailing to full zip code areas and in publications with countywide circulation or greater.

12.9   In exchange for Employee's covenants to Employer in this agreement, Employer is furnishing to Employee, in addition to Employee's compensation, valuable consideration, including,

{00023607.DOC}8

but not limited to: (i) the opportunity to provide prosthetic, orthotic, breast restoration, Skin Tone restoration and anaplastology services to, and to develop a relationship with, clients of Employer; (ii) access to confidential information about Employer's management practices, clients, research and development, organization, operations and strategies; (iii) access to Employer's business and professional contacts; (iv) the availability of expensive prosthetics, orthotics, breast restoration, Skin Tone manufacturing and anaplastology equipment, as well as office equipment and a trained and adequate staff; and (vi) specialized training, as necessary, to provide the technical services according to Employer's standards. In consideration of the items listed above, Employee hereby agrees to the covenants set forth in this Article.

12.10   Neither the public in general nor any patients will be adversely affected by the enforcement of the restrictive covenant contained herein, in that other similar providers of prosthetics and orthotics services are readily accessible and available within the Restricted Area.

12.11   Employee acknowledges that others with whom he works with hereunder are vitally important employees of Employer's business. Employee covenants that during the Restrictive Period, Employee shall not, directly or indirectly, without the prior written permission of Employer, recruit or attempt to recruit for employment, or solicit or encourage to leave employment with Employer, any other employee of Employer as of the date of such termination or any former employee who has not at that time ceased to be employed by the Employer for a period of at least one (1) year.

12.12   The terms of this Article 12 shall survive termination or cancellation of this agreement and/or dissolution of the Employer.

## 13.   NOTICES

Any notice or communications required or permitted hereunder shall be deemed to have been sufficiently given or served for all purposes if in writing and delivered personally to the party or to an officer of the party, or sent by registered or certified mail, postage and charges prepaid, return receipt requested to the parties' addresses as set forth below:

To the Employer:
A Step Ahead- Boston, LLC
21 A Street
Burlington, MA 01803

To the Employee:
Jerry Scandifio
32 Dury Lane
Wakefield, MA 01880

or such other address as may subsequently be provided to the other party in writing. Unless otherwise expressly set forth in this agreement, any such notice shall be deemed to be given on the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as above.

## 14.   GOVERNING LAW

This agreement shall be construed, interpreted, and the rights of the parties determined in accordance with, the laws of the State of Massachussetts, except to the extent that matters relating to healthcare regulatory compliance are required to be governed by the laws of another jurisdiction.

The parties agree that if a controversy or claim between or among them arises out of or in relation to this agreement and results in litigation, the courts of Middlesex County, Massachusetts or the courts of the United States of America located in Middlesex County, Massachusetts shall have exclusive jurisdiction to hear and decide such matter, and the parties hereby submit to jurisdiction to such courts.

## 15.   MAIL

16.1   The Employee hereby agrees that any and all mail and other correspondence addressed to Employee, which arose out of Employee's employment hereunder, shall belong to and is hereby assigned to Employer, whether said mail and correspondence is received during or subsequent to the termination of employment and Employee hereby authorizes Employer to open any mail addressed to Employee arising out of or by reason of the employment hereunder. Employer agrees to forward all personal mail to Employee at the address set forth above.

16.2   Employee shall never divert nor attempt to divert any mail and/or other correspondence that is otherwise intended for Employer.

## 16.   MISCELLANEOUS

16.1   Entire Employment Agreement; Amendments.  This agreement, including the Exhibits attached hereto, constitutes the entire agreement between the parties pertaining to the employment relationship between Employer and Employee and supersedes all prior or contemporaneous agreements, understandings, or negotiations of the parties. This Employment Agreement shall not be modified, amended, or supplemented except in a written instrument executed by both parties.

16.2   Force Majeure.  Neither party shall be liable for or deemed to be in default for any delay or failure to perform any act under this agreement (other than the payment of money) resulting directly or indirectly, from acts of god, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquake, flood, failure of transportation, strikes or other work stoppages by either party's employees, or any other cause beyond the reasonable control of such party.

16.3   Captions.  The Article captions contained in this agreement are inserted only as a matter of convenience and reference, and in no way define, limit or describe the scope of this agreement, nor the intent of any provision thereof.

16.4   Severability. The terms, conditions, covenants, warranties and representations of this agreement shall be considered mutually independent and exclusive of each other.

16.5   Construction.  Common nouns and pronouns and all other terms shall be deemed to refer to the masculine, feminine, neuter, singular and/or plural, as the identity of the person or persons, entity or association may require in the context.

16:8   Saving Clause. If any provision contained in this Paragraph or anywhere in this agreement shall be deemed by any court of competent jurisdiction to be invalid, illegal or unenforceable, then such provision shall be modified so as to make it valid, legal and enforceable to the fullest extent permitted by law, and the parties agree that such paragraph or provision shall be enforceable to such extent.

IN WITNESS WHEREOF this agreement has been subscribed as of the date first above written.

A STEP AHEAD PROSTHETICS
& ORTHOTICS, LLC, *Employer*

By: _____                    _____
    Erik Schäffer, *President*                   Jerry Scandifio, C.P.

## EXHIBIT A

## DUTIES AND RESPONSIBILITIES

ABC Certified Prosthetist

Prosthetic care may include, *but is not limited to*, patient evaluation, prosthesis design, fabrication, fitting and modification to treat limb loss for purposes of restoring physiological function and/or cosmesis.

The prosthetist certified by ABC is bound by the ABC Code of Professional Responsibility, which is enforced by a Professional Discipline program. The certified prosthetist is obligated to support and conform to professional responsibilities that promote and assure the overall welfare of the patient and the integrity of the profession. The time limited certification expires without compliance with requirements of the Mandatory Continuing Education program. The practice of an ABC certified prosthetist includes, *but is not limited to*:

1) Assessment of patients with impairment of human movement or musculoskeletal abnormalities that would impede their ability to participate in their social environment or other activities in order to determine a functional intervention. Patient assessment may include, *but is not limited to*, the evaluation of:

• Anthropometric data
• Cognition
• Circulation
• Skin integrity
• Protective sensation
• Pain
• Central and peripheral nerve
• Respiratory capacity
• Biomechanics
• Gait analysis including temporal and spatial assessment
• Range of motion
• Muscle strength
• Posture and balance

- Proprioception
- Prosthetic requirements
- Myoelectric activity and potential
- Activities of daily living
- Environmental barriers including social, home, and work reintegration
- The need for physical and occupational therapy modalities

2) Formulation of a treatment plan based upon a comprehensive assessment to design and intervention to alleviate limitations and enhance function. Prosthetic treatment includes, *but is not limited to*:

- Verification of prescription/documentation
- Evaluation of the prescription rationale
- A needs assessment based on patient and/or caregiver input
- Development of functional goals
- Analysis of structural and design requirements
- Assessment of potential physical or occupational therapy requirements
- Consultation with and/or referral to other health care professionals

3) Implementation of the orthotic and/or prosthetic treatment plan includes, *but is not limited to*:

- Acquisition of anthropometric data
- Modification and/or rectification of anthropometric data
- Preparatory care
- Material selection
- Fabrication of prostheses
- Prototype development including evaluative wear
- Structural evaluation
- Diagnostic fitting
- Assessment of intervention
- Functional exercise
- Gait training
- Functional training (both self care and work related)
- Patient education and instruction
- Supervision of the provision of care

4) Utilization of a follow up treatment plan that ensures successful prosthetic outcomes, patient health and quality of life which includes, *but is not limited to*:

- Documentation of functional changes
- Formulation of modifications to ensure successful outcomes
- Reassessment of patient expectations
- Reassessment of treatment objectives
- Development of long term treatment plan
- Confirmation of patient education and instruction
- Evidence based practice

5) Compliance with practice management plans to develop and document policies and procedures to ensure patient protection, which includes, *but is not limited to*:

- Adherence to applicable local, state and federal laws and regulations
- Following patient care guidelines and procedures
- Maintaining a safe and professional environment for patient care
- Comprehension of claims development and submission

6) Promotion of competency and enhancement of orthotic and/or prosthetic professional practice to contribute to the profession's body of knowledge includes, *but is not limited to* participation in:

- Continuing education
- Training of resident/students
- Clinical research
- Evidence based studies
- Promotion of public awareness of the orthotic and/or prosthetic profession
- Consumer organizations, governmental and non-governmental organizations

Job description is not limited to only the above mentioned; it also includes advancements in technology and future endeavors.

2

# EXHIBIT 2

Jerry,

We are pleased to offer you a salaried position **ABC Certified Prosthetist** position with our company and feel that your skills will significantly add to the development of our business. The following details the arrangement that we are offering.

**Salary**
Starting at——————————————————————————$110,000.00
2 weeks paid vacation (accrual based)-Increased to 3 weeks at the beginning of year four
3 sick days (accrual based)

**Health Insurance**
Eligible for individual health care plan starting on date of hire, annual value: $6,682.00

**Business Hours**
Monday –Thursday          8am –4pm
Friday                              7:30am -2:30pm
Prosthetists are expected to report to the office by 6am each day.

**2015 Holidays**
Not limited to the days below; days vary depending on the times they fall according to each year...

| January-1st | Thursday | New Years Day | (full day closed) |
|---|---|---|---|
| January-2ed | Friday | New Years Day | (full day closed) |
| May-25th | Monday | Memorial Day | (full day closed) |
| July-3rd | Friday | Independence Day | (1/2day) |
| September-7th | Monday | Labor Day | (full day closed) |
| November-25th | Wednesday | pre Thanksgiving Day | (1\2 day) |
| November-26th | Thursday | Thanksgiving | (full day closed) |
| November-27th | Friday | post Thanksgiving Day | (full day closed) |
| December- 24th | Thursday | Christmas eve | (1\2 day) |
| December-25th | Friday | Christmas Day | (full day closed) |

**401K**
Eligible to participate in current plan after first full year of employment with percentage match. It is the best plan NY state will allow an owner to give by law.

**Profit Sharing/Ownership Consideration**
At the beginning of year four you will be eligible for 2.5% profit sharing increasing to 5% at the beginning of year 5 and then increasing by 1% in years 6-10. At the end of year ten you will be fully vested as an equity partner for a 10% stake.

Acceptance

Signature: _Strld Sudffer_____          Date: _2/31 2015_

A TRUE COPY ATTEST

DEPUTY SHERIFF
Middlesex County
07-07-2020

## Commonwealth of Massachusetts

MIDDLESEX,SS.

TRIAL COURT OF THE COMMONWEALTH
SUPERIOR COURT DEPARTMENT DATE OF SERVICE
CIVIL DOCKET NO.20-1435

Gerald Scandiffio _____ , PLAINTIFF(S),

v.

A Step Ahead – Boston, LLC _____ , DEFENDANT(S)

### SUMMONS

THIS SUMMONS IS DIRECTED TO __A Step Ahead – Boston, LLC__ . (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the Middlesex Superior _____ Court. **YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1.  **You must respond to this lawsuit in writing within 20 days.** If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2.  **How to Respond.** To respond to this lawsuit, you must file a written response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:
    a.  Filing your **signed original** response with the Clerk's Office for Civil Business, Superior _____ Court, _____ (address), by mail or in person, **AND**
    b.  Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: Charles Kindregan, 470 Atlantic Ave, suite 400 Boston MA 02210

3.  **What to include in your response.** An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your Answer or in a written demand for a jury trial that you must send to the other side and file with the court no more than 10 days after sending your Answer. You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12.** If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at www.mass.gov/courts/case-legal-res/rules of court.

\* Civil Clerk's Office, 200 Tradecenter Woburn MA 01801

4.     **Legal Assistance.** You may wish to get legal help from a lawyer.  If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

5.     **Required information on all filings:** The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant, Chief Justice on _____*June 26*_____, 20_*20*_

_(signature)_
_____
Michael A. Sullivan
Clerk-Magistrate

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

## PROOF OF SERVICE OF PROCESS

        I hereby certify that on_____, 20____ , I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated:_____ , 20____     Signature: _____

**N.B.     TO PROCESS SERVER:**

        PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

_____
|                             |
|                     , 20___ |
|_____|

| CIVIL TRACKING ORDER (STANDING ORDER 1-88) | DOCKET NUMBER 2081CV01435 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: Scandiffio, Gerald vs. A Step Ahead- Boston, LLC | | Michael A. Sullivan, Clerk of Court Middlesex County |
| TO: Charles P Kindregan, Esq. Beacon Law Group, LLC 470 Atlantic Ave Suite 400 Boston, MA 02210 | | COURT NAME & ADDRESS Middlesex County Superior Court - Woburn 200 Trade Center Woburn, MA 01801 |

### TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

**STAGES OF LITIGATION**        **DEADLINE**

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 09/21/2020 | |
| Response to the complaint filed (also see MRCP 12) | | 10/20/2020 | |
| All motions under MRCP 12, 19, and 20 | 10/20/2020 | 11/19/2020 | 12/21/2020 |
| All motions under MRCP 15 | 10/20/2020 | 11/19/2020 | 12/21/2020 |
| All discovery requests and depositions served and non-expert depositions completed | 04/19/2021 | | |
| All motions under MRCP 56 | 05/18/2021 | 06/17/2021 | |
| Final pre-trial conference held and/or firm trial date set | | | 10/15/2021 |
| Case shall be resolved and judgment shall issue by | | | 06/22/2022 |

The final pre-trial deadline is <u>not the scheduled date of the conference</u>. You will be notified of that date at a later time.

Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.

This case is assigned to

| DATE ISSUED 06/23/2020 | ASSISTANT CLERK Arthur T DeGuglielmo | | PHONE (781)939-2757 |
|---|---|---|---|

Date/Time Printed: 06-23-2020 00:15:51        SCV029, 06/2015

B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GERALD SCANDIFFIO., ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> A STEP AHEAD – BOSTON, LLC, ) <br>     Defendant. ) <br> ) | C.A. No.: 2081CV01435 |

## **NOTICE OF REMOVAL TO ALL ADVERSE PARTIES**

NOTICE IS HEREBY GIVEN that on Wednesday, August 5, 2020, Defendant A Step

Ahead – Boston, LLC filed a Notice of Removal of this action in the United States District Court

for the District of Massachusetts. A Copy of the Notice of Remvoal so filed is attached hereto.

This Notice is served upon you as a party to this action in compliance with 28 U.S.C. §

1446.

Respectfully Submitted,

A STEP AHEAD – BOSTON, LLC

By their attorneys,

MARCUS, ERRICO, EMMER, &
BROOKS, P.C.

   /s/ Edmund A. Allcock
Edmund A. Allcock, Esq., BBO # 566718
Anthony M. Gallino, Esq., BBO# 705378
45 Braintree Hill Office Park, Suite 107
Braintree, MA 02184
(781) 843-5000
eallacock@meeb.com
agallino@meeb.com

Dated: August 5, 2020.

## CERTIFICATE OF SERVICE

I, Edmund A. Allcock, hereby certify that on August 5, 2020 that I served the foregoing document (and any exhibits) upon all parties appearing pro se, if any, and all counsel of record by first class mail and e-mail.


_/s/ Edmund A. Allcock_____

Edmund A. Allcock

C

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

MIDDLESEX SUPERIOR COURT
DEPARTMENT OF THE TRIAL
COURT
C.A. No. 2081CV01435

|  |  |
|---|---|
| GERALD SCANDIFFIO<br>Plaintiff,<br><br>v.<br><br>A STEP AHEAD – BOSTON, LLC<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## NOTICE OF FILING OF NOTICE OF REMOVAL

NOTICE IS HEREBY GIVEN that on August 5, 2020, Defendant A Step Ahead –

Boston, LLC, file a Notice of Removal of this action in the United States District Court for the

District of Massachusetts. A Copy of the Notice of Removal so filed, without exhibits, is

attached hereto as Exhibit A. A copy of the Notice of Removal to All Adverse Parties so filed,

without exhibits, is attached hereto as Exhibit B. The Notice of Removal and all exhibits will be

served on all parties and counsel of record. Furthermore, pursuant to 28 U.S.C. § 1446(d), this

matter shall proceed no further unless and until this case is remanded to this Court by the United

States District Court.

Respectfully Submitted,

A STEP AHEAD – BOSTON, LLC

By its attorneys,

MARCUS, ERRICO, EMMER, &
BROOKS, P.C.


   /s/ Edmund A. Allcock
Edmund A. Allcock, Esq., BBO# 566718
Anthony M. Gallino, Esq., BBO# 705378
45 Braintree Hill Office Park, Suite 107
Braintree, MA 02184
(781) 843-5000
eallcock@meeb.com
agallino@meeb.com

Dated: August 5, 2020

## CERTIFICATE OF SERVICE

I, Edmund A. Allcock, hereby certify that on August 5, 2020 that I served the foregoing document (and any exhibits) upon all parties appearing pro se, if any, and all counsel of record by first class mail and e-mail.


   /s/ Edmund A. Allcock

Edmund A. Allcock